Final case for argument this morning is 14-1483, DePuy Synthes Products v. Globus Medical, Inc. There are several grounds for reversal of the district court judgment here, but I'd like to focus principally on the claim construction issues, which cut across all three patents. Beginning with the connection issue for the 076 patent, the key concept is simple. Claim 1, the only independent claim, requires the implant's bone screws to be sized and configured, quote, to anchor the intervertebral implant to the upper and lower vertebrae and the heads of the first and second bone screws. So three things follow from this language. First of all, the implant has to be anchored to both the vertebrae and the bone screw heads. Second, the word anchor has to mean the same thing as to both connections. It's the same word in the same phrase, so whatever it means for screws to be anchored to the vertebrae, that's what it means for the screw heads to be anchored to the implant. And third, the plain meaning of anchor, and this is confirmed by Synthes' own definition and the specification, is a rigid or firm connection. Can you remind me what did Judge Stark say in response to this particular argument of yours on claim construction, this sort of textual treatment of how anchors should be understood? On the last day of trial, Your Honor, he was the first time he had construed this claim. The claim was not construed at the claim construction phase, and Globus, as the defendant, not bearing the burden on the issue of infringement, relied on the claim's plain meaning. Then, so the trial proceeded, Globus presented evidence on the issue of what the plain meaning of anchor is. We said it required a rigid connection. And on the last day of trial, after Globus' whole defense had been presented, Synthes said, this needs to be construed, and the district court said, I'm going to construe this as follows. And I'll quote. He said, nothing in this claim, or any other claim of the asserted patents, requires that an accused device have bone screws that are locked, threaded, or otherwise rigidly connected to the front plate in order to infringe. Now, he thought he had... Is that your... I'm just to add on a little bit of a question to Judge Stark. So, is what was going on here, he had construed the 2000...  The 2007 patent that way. That's exactly right, Your Honor. And then he just thought, well, I've already construed that term in that context, and it ought not to be different. But your view is you clearly maintained, preserved your ability to argue two different constructions. Were you arguing rigid for the 2007 patent? We were arguing rigid for the 2007, Your Honor. But I would note that there are different patents with different specifications, and some differences in claim language as well. Is there any... If we were to hypothetically agree with you on the claim construction of the 076 patent, is there still a question of infringement that lies out there under that claim construction? No, Your Honor. If a rigid connection is required, it's undisputed that Globus's bone screw heads are round. The boreholes in his products are round. They're smooth. They toggle. There is no rigid connection. But maybe there's an argument that the camming screw that arguably serves as a securing plate provides that rigid connection. That speaks to a separate limitation under the 2007 patent. First of all, the 076 patent... Right, right. I want to keep it straight, too. But I'm just trying to say that in terms of trying to understand, I guess, your conception of what rigid connection means, it may not necessarily be scoped down to just threadings of the screw heads and the boreholes. Correct. And so that's why, to follow up on the Chief's question, maybe there's still an infringement question that would have to be resolved below, assuming we were to agree with you on this construction for anchor. The first thing you need to know, Your Honor, is that the 076 patent does not contain the securing plate limitation. So... No, I know. So now you get into the 207... We're talking about just comparing the understanding of what this claim is to your accused product. Right. Forget about any other patent. That's all we're trying to figure out. And if we understand the claim, it's best understood to be about rigid connection. Now the question is whether your accused product, with your camming screw, is that a rigid... Does that provide a rigid connection? Is that an open question that needs to be resolved? It doesn't, and I don't believe that Cynthia has suggested that. And that's because the securing plate and the anchorability within the boreholes serve different functions, and they're basically independent ways of accomplishing the same objective of preventing back out. They both are designed to prevent back out. They're sort of a belt and spender's approach, but they do it in different ways. In the case of the securing plate, it's bicoloring. In the case of the connection in the borehole, whether it's the 207... And maybe we'll hear in 10 minutes what their theory is on whether, should the claim of construction be overturned if there's still an open question on infringement. So that may be a better question for them. But getting back to you, I'm assuming in your JAMAL, or in opposition to the JAMAL, no, it was your JAMAL motion, did you argue this grammatical question about the entire clause, and then therefore what this entire clause means? We did, Your Honor. And then what did Judge Stark say in response to that? I mean, everything else you were telling me is what happened at trial. Sure. What did Judge Stark say in the JAMAL decision on this particular grammatical question? You'll find his analysis on pages 13 to 14 of the appendix, and I think the best answer to their argument is that this argument is in waves. He didn't dig deeply into the text. He simply said at the end of trial, this came up at the end of trial, on the last day of trial, since he raised a new argument, and he said, I basically explained why. If you look at 17440 to 17441 of the appendix, that's where he explains at the end of the trial, I decided this at claim construction. He didn't decide it at claim construction. He never interpreted the relevant language of the 076 act. He interpreted the anchorable within limitation of the 207. He rested on his 207 construction for any argument he would make on anchor for the 076. Essentially, that's right. He said, I don't believe these patents require a rigid connection. Now, I'll get to in a minute why we think that's wrong, even as to the 207, but I'd like to focus the Court's attention on page 892. Just a quick question. I believe I know the answer to this, but just, did Judge Stark rely on any type of extrinsic evidence in his claim construction? No, Your Honor. Okay. He didn't know what was in his claim construction. Well, just in defense of Judge Stark, not that he needs my defense, but looking in what you were just pointing, page 13 and 14, I mean, he's dealing, in some part, he raised due process arguments, right? So, he was left with, I mean, we're not talking here about whether or not your due process rights are violated, and he's dealing with those arguments you're making, which are correctly, understandably disposed of. That was part of his analysis, right. And you don't need to reach the due process issue if you agree with us on the claim construction, but I would note that what he did goes far beyond what's been permitted by this Court's ruling claim construction cases. He construed this key term at the end of trial and after we had rested. Can we move on? Just a quick question, Your Honor. So, on the 076, didn't Judge Stark say that the specification included non-rigid examples? On the 076, he concluded they both did. That's inaccurate. Right. There are not non-rigid connections in the 076 specifications. But there are on the 207. There's one example of non-rigid connections in the 207 patents. So, your argument is by making the same claim construction on both, then he's importing a limitation in the... That's right, from the wrong patent. Right, from the wrong patent. And I'd like to focus this Court's attention on page 92 of the appendix. It's a critical passage in the brief summary of the invention on the 076. This is what the inventor said. This invention creates an intervertebral implant, which is... Where are you on the... Column one. Column one? Of the 076. Of the 076 on page 892. This invention creates an intervertebral implant, which is... Is that line 43? I apologize, but I didn't write down the line. It's column one. It's line 43. Sorry. It's a three-sentence passage. Creates an intervertebral implant, which is able to rigidly connect to bone affixation means in a manner that even in the event of bone structure weakening, loosening between the intervertebral implant and the bone affixation means shall be precluded. That's first sentence. Second sentence, and this is critical. The above problem, the loosening, and it's elaborated even more further above, is solved in the present invention by an intervertebral implant exhibiting the features of claim one. Okay. Let me just... You're reading stuff that's already in the record and that Judge Chen has obviously memorized already, so let's move on. I think I want your time to run out before you... Let me turn to the 207 then, because the 207 contains similar but not identical language. No, but can we turn to the position between limitations? Sure. Happy to talk about whatever you want. You're almost done here, so I just want to get into this position between stuff. Right. Okay. Give us your argument. Sorry, Judge Stark missed that one. Sure. The text requires the plates boreholes to be, quote, positioned between the spacer's upper and lower planes. District court said boreholes can be positioned, quote, partly or entirely within the upper and lower planes. The problem with that is that synthese expressly disclaimed that reading during prosecution to overcome anticipation objection based on phrasers. This is really a situation where a picture paints a thousand words. You'll see the pictures on page 48 of our opening brief and 22 of our reply. Synthese's own annotation of phrasers, it shows that the boreholes and the screw heads are partly inside and partly outside the claim. The clear and unambiguous takeaway of this is that the claim only covers boreholes that are completely within the plane. Yeah, but can't phraser put its boreholes on tabs? And it's the tabs that extend inwardly and outwardly, right? Well, I think... And let me just finish and then you can tell me whether I'm right or wrong. So it seems to me if their boreholes are on tabs, then they disclaimed implants that put the boreholes on these types of tabs. But why does that necessarily lead us to where you want us to go, which is they disclaimed your embodiments, which are the eyebrows, right? I think phraser essentially uses the tabs and boreholes as synonymous concepts. If you look at the pictures, you see that the cross section, and this is on page 22 of our reply, you look at the upper and lower planes, you see the boreholes and the cross section of the upper plane cuts right through them, cuts through the middle of them. Now, phraser used locking screws. You'll find that on page 28,000, front and center of the appendix. He used locking screws so that their argument, that essentially there's some difference. These red lines on the gray brief point here, whose lines are those? We added the annotations on 22. They added the plane annotations in our opening brief, which is a figure eight. All right. Figure eight is simply a different view, and phraser explains that the figures one, two, and three, so everything contained in figure eight, or figure eight contains all the elements that are contained in the first three figures in phraser. The features shown in figures one, two, and three are present in figure eight, although it's shown from a cross section. What is it in the prosecution history that gets you to the conclusion that the patent owner indisputably disclaimed everything except when the boreholes and the screw heads are Well, there are two things. There are the pictures themselves. We can clearly show that. They're annotated by synthese and further annotated in our briefs. And second of all, what they said about figure eight, it says the bone screw holes, and hence the heads of the bone screws, are not positioned between the upper and lower plates of the body. Those are synthese. Right? Was there an express disclaimer, though, other than the figures? Well, that what I just read you was an express disclaimer of the language. So you've got the pictures telling the story and then the language that corresponds with the story. And the technology in phraser was such that because there were locking screws, the diameter of the borehole was essentially the diameter of the screw head. I mean, I agree with you to the extent that you say that when they drew lines and annotations on phraser figure eight, now it's no longer phraser's figure. It now becomes their figure. Absolutely, your honor. But at the same time, those annotations don't necessarily convey necessarily that they gave up everything except for screw heads and boreholes to be entirely between. Because when you look at the annotated phraser figure, I mean, at best what we see are the tiniest portion of phraser's screw heads crossing the boundary over the plane lines. And so, I guess what I'm wondering is, maybe there's a problem with a claim construction that says any screw heads or boreholes that are partly inside and outside the boundary lines, maybe there's a problem with that, but that's not necessarily the same thing as saying that they disclaimed everything except screw heads and boreholes being entirely within the boundary lines. Well, respectfully, I disagree with how much is below the plane. But even if, in your words, the tiniest portion is below the plane, the district court's claim says partly or entirely. That construction is foreclosed if even the tiniest portion is below the plane. So, I see that my time, I assume this is, is it 30 seconds in my opening? You're done. Well, we've scored two minutes of your time. Thank you. May I please report? I would actually like to start with the 207 patent because upholding proper judgment on that patent alone means that Globus is liable for the full amount of damages. Now, I'd like to go straight to the 207. I mean, right now, first of all, you've completely scrambled my brain by making me go to 207. I apologize. And before I even allow you to do that, can you tell me the theory on why, if the 207 infringement is sustained, then all the damages blow? Of course. Because the jury provided the same royalty for the entire damages period, and that included both the damages period for the 207 patent, which only that patent was in play, and when all three patents were in play. And both experts, throughout the course of the trial, applied a flat rate to whether the 207 patent was infringed or to whether all the patents were infringed. Timothy's expert applied a 15% royalty. Globus's expert applied a 3.5%. Can you help me? Did you make this argument in the red brief? We did. And it worked to the end. All right. Where we said a 15% royalty was the flat rate. For all the patents. For all the patents, correct. And we cited Mr. Gearing's testimony where he said, I don't believe that the royalty rate would change and that the A17, 549. And just a word about Mr. Gearing's false testimony. Judge Stark is reviewing those issues now. His testimony was about his credentials, not about his actual qualifications or a master's with coursework towards PhD. But both parties asked the court to rule on the issues before it, and Mr. Gearing is not one of them. But in all events, we know what the jury did. They applied a 15% royalty when only the 207 patent was in play. We know what Judge Stark did, and this is at A2. He applied a flat ongoing royalty of 18% for infringement by any product of any patent. And that's how the evidence came in. So this is not a situation where we don't know how the jury allocated damages. We know exactly how they allocated the damages. And that means that a proper judgment on the 207 patent is upheld. The damages verdict sticks. Now, as made clear by the 207 patent, the plain meaning of anchorable within is not synonymous with rigidly connected to or threaded heads or other types of locking screws. And we need to look no further than the specification on column 5, lines 1 through 2, that describe fixation elements, which is the language used in the claim. Fixation elements can have a smooth head so that there will not be a rigid connection with the implant. Globus's construction would read that embodiment out of the claim. Secondly, Claim 30 describes threadless cylindrical pins. Those, by the way, are also described in the 076 patent. So there is non-rigid connection, fixation elements described in the 076 patent. The Claim 30 here describes threadless cylindrical pins. Column 5, 29 through 31, describes those as trocars. That's essentially a hollow nail. That is distinctly not a rigid connection. So Globus's construction would read a dependent claim out of the patent. And third, recall that the claim says that the fixation elements have to be anchorable within the boreholes and the partial boreholes. And if you take a look at page 6 of the red brief, we have a blow-up of the 616 and the 207 patent figures. Those partial boreholes are labeled as 9-out. There are just little cutouts on the spacer. Even if you had threaded inserts on those cutouts, you could not have a rigid connection, particularly with a threadless cylindrical pin as in Claim 30. But your spec does contemplate having threaded heads and threaded boreholes. Of course it does. So just because you have some figures that don't show that doesn't answer the question. But it also contemplates having things like threadless cylindrical pins. Yeah, you've got two alternatives. But every time the word anchor shows up in the spec, it seems to be really talking about the rigid connection embodiment, not the non-rigid connection embodiment. When anchor shows up in the spec, it's talking about anchoring the implant to the bone. And I think that's important here because the specification actually criticizes, and this is at column 1, lines 31 through 39, it criticizes a rigid connection between the bone screws or the fixation element and the spacer. It says it puts too much stress on the spacer. So Globus' construction would actually read into the claims the very problem that the inventors were attempting to solve. Well, I disagree because your patent also encompasses an embodiment with the threaded heads and the threaded boreholes. The whole point of your invention is you've got the securing plate on the backside. So now you have the belt and suspenders. You didn't disclaim all embodiments that have a possibility of threaded heads and threaded boreholes. Oh, absolutely not. In fact, that's how I would refer to them. Exactly. So the fact that there's criticism of an embodiment in the prior art that has only threaded heads and threaded boreholes doesn't necessarily take us into reading the claim as necessarily excluding that embodiment. But those are between the plate and the bone screws. Not between the bone screws and the spacer. And that's what the patent criticizes because when you have a rigid connection and the claim says within the boreholes and the partial boreholes, your rigid connection with the partial boreholes is precisely what's criticized. Well, how does that answer the question about why the usage of the term anchorable in the written description seems to be devoted to the threaded embodiment? I would submit that it's not. That what's anchored is the implant to the bone. What's used to anchor the implant to the bone, as claimed, is the fixation elements. Those fixation elements are described as non-rigid and rigid connections. So that's how anchorable is used. And whatever anchorable means, it has to be consistent with, for example, on column two, when it's describing anchoring the implant to the bone, there's such a thing called, sorry, column three, at the bottom it's called stress healing. And this is when the plate and the spacer are slidable. That is described as being anchored to the bone, yet those components can move relative to each other and therefore relative to the bone. So anchor cannot mean a rigid, locked connection. In fact, even the ordinary meaning of anchor is not a rigid connection. We all know what anchor means. You anchor a boat to the ocean floor, it doesn't mean that that boat is locked in place. It's simply constrained. That's how the inventors were using it here. So what does this mean in column five? Starting in line 11, the head 21 may preferably be provided with an external thread 25, which corresponds to the internal thread 11 of borehole 9, so that the heads 21 can be anchored in the boreholes 9 in a rigid manner. I seem to be thinking about the word anchor in a very specific way, about rigidly connecting the threaded heads with the threaded boreholes. It's anchored in the borehole, not to the borehole, anchored in the borehole to a rigid manner. And it's important to recognize that when it's talking about anchoring, it's talking about anchoring something to the bone. When it's talking about something rigidly connected, it's talking about the interface between the plate and the fixation elements. And the patent is entirely consistent throughout in that regard. Can I move you on to, since you're placing so much reliance on the 207 patent, to the securing plate limitation for you? It seems that the construction, I guess, it's your understanding that the client construction has not been appealed here, and we're just dealing with an infringement question? That's correct, yes. Well, when you talk about a securing plate, there's an image of a securing plate, and that image is not really consistent with when you're looking at this eyebrow stuff and this thing in the middle that's a securing plate, right? So, give me your argument as to why the infringement verdict was correct here. Right, we never said that a screw is a plate, we said that the head of the screw is a plate. And if you take a look, if you're still up on page 6 on Cynthia's brief, you can see that what's labeled 18 is the exemplified plate, what's labeled 16 is the reverie to page 6. All right. So, 18 is the securing plate, 16 is the mechanism to attach that plate to the implant. What Globus did was just combine those two components into one, 16 to 18. But making those things part of an integral structure does not change the fact that they have a securing plate. In fact, Judge Stark confirmed in his JMAW that his construction did not require the securing plate to be a standalone freestanding structure. And the jury was permitted to ignore the threaded shaft on their securing plate. The Claim 1 does not limit the means by which the securing plate has to be attached to the implant. And the shaft does not turn that securing plate into something other than a securing plate. In fact, both experts agreed that they could identify the head. This is not as if the claim is to a chocolate bunny and we're trying to accuse a block of chocolate. Every expert could identify the head of the screw as a structure, they could measure it, and it was undisputed that it met Judge Stark's claim construction, planar dimension greater than a thickness, and it's undisputed that that head blocked the bone screws from backing out. So, the jury was right to find that that was a securing plate. So, the point is a screw head is still a screw head and serves the normal conventional purpose that the head has, but it also, in this particular context, serves a second purpose, which is to be this securing plate. That's correct, Your Honor. Can we go back to where we started? Because I thought it caught us off guard on this damages argument. Isn't it just the norm? I mean, the verdict form, the jury was not asked to differentiate between the three patents before it when it awarded damages. And I think your friend on the other side does talk about at least some testimony by Dr. Gehring that suggests that fewer patents might result in a lesser loyalty. But how much do they really need to show when we are faced with a damages verdict that deals with three patents? That is assuming that we disagree with you on at least one of the patents. Right. Well, the normal rule applies when it's not clear, when there's a bunch of different patents accusing different products. We don't know how the jury applied the rate to each of those products. Here, the verdict form laid out every product infringed every asserted claim. And the jury wasn't left with much of an option. Our expert said he's a flat rate of 15%. They say he equivocated, but he said twice the rate is 15% no matter which patent has been infringed. And their own expert applied a flat rate. Granted, it was a different rate, but a flat rate. And Judge Stark knew this when he applied a flat rate for the ongoing royalty. So it's not a situation where we don't know which products infringed which patents. Every product infringed every patent according to the jury. And they applied exactly what the experts are telling them to apply, a flat rate whether it was to the 207 patent alone or to all patents. And that's precisely what Globus' expert was asking them to do as well. So we know how the jury allocated the damage. Doesn't the instruction, doesn't it assume that a flat rate applies if you have infringement as to all patents? The instruction wasn't specific as to one or all. And that instruction was agreed upon. They have not suggested it as a solution. Yeah, but doesn't that cut against you rather than for you? You agreed to it too, and it doesn't differentiate. Right, because after the trial, everybody knew during the charge conference that both experts were applying a rate, the same rate, regardless of whether it was a 207 patent alone or all three patents together. There was no reason to instruct. That would have just confused the jury. As to the, with my remaining time, as to the position between this and that, well, first of all, there was no express disclaimers. We never said that Frazer did not show partly between or substantially between or entirely between. We just said Frazer didn't show between. Do you agree that your annotation during the prosecution history, figure 8 of Frazer, shows those boundary lines, those plain lines, cutting through the screw head such that the Frazer screw head is partly inside the boundaries and partly outside the boundaries? I would submit, Your Honor, two things. One, we're reading an awful lot of precision into that figure, where those lines... Well, do you see what I see? How about, let's just... It's our statement, no doubt. Yeah, but when we are looking at the figure together, your annotated figure 8, do you see what I see? If I look at their blow-up, I see these red marks, and I think there's an argument there. The issue... Just agree that it's there, then. Okay. We'll agree that it's there. Now what do we do? Now we look at figure 2. How do we defend a claim construction that says that anything that's entirely between or partly between and therefore partly outside the boundary lines, in fact, infringes this claim? Okay, so there's no express disclaimer. This would be an implied disclaimer. The problem is that figure 8 was not the only figure in the file history. There was also figure 3 with plain lines drawn. It appeared to show that the boreholes were outside, and this annotation that Loeb has provided in their figure 2, which is... We're just talking about figure 8. I mean, the public, competitors, the examiner, they're entitled to rely on each and every individual figure that's annotated or argued about by the applicant. Let's just talk about figure 8. Is there anyone in my mind that matters for purposes of prosecution disclaimer? Well, maybe that's true, but what also matters is what Frazier discloses. No disclosure about the importance of the boreholes being between the planes. This figure 2 embodiment that they drew the red lines, had they drawn those lines from back corner to front corner as in figure 8, those boreholes would be entirely outside of those planes. So Frazier itself is ambiguous. And it's hard to imagine how there could be a clear and unmistakable and unambiguous disavow of claims scope when the reference itself is ambiguous on that time frame. You can finish it. Do you have your answer? Unless we have more questions for you. Thank you. Could you start with the damages? Of course, we'd be happy to, Your Honor. The verdict form, the damages form, did not differentiate between the patents. And it's under the general rule. He referred to a flat rate. Well, our expert testified up to a range of 3 to 5 percent. You'll see that on page 17,700 of the appendix. So, it's really pure speculation as to what the jury would have done here. And their own expert, Mr. Gehring, not Dr. Gehring, acknowledged that they'd be negotiating for less in the case of less than 3 patents and that the royalty rate could decrease to 10 percent. That's at 17,556. So, there should be no question that the damages verdict is gone entirely if you reverse as to one of these issues. Second, on anchorable within, Mr. Lowe said the ordinary meaning of connection does not require rigid connection. I'd like to quote their definition from Webster's. Plain meaning general dictionary You can find it on page 1,002 of the appendix. It says, to anchor is to secure firmly, colon, fix. Now, they omitted the word fix in their quotation of this definition in their briefs. But it speaks volumes. The idea of an anchor is to hold. And if something doesn't hold, it's not serving an anchoring function. An anchor doesn't necessarily hold rigidly. Like the example of an anchor on a ship. The rope will hold the boat secure to the ocean floor but yet the boat has movement. Just like in the pads, there's some movement that's medically necessary. There is some movement that's medically necessary but note that what doesn't move is the anchor that doesn't move. The rope moves, the boat moves. But where the anchor is, if it's not holding, it's not anchoring. You're drifting across the lake, the ocean, whatever it might happen to be. So, their own definition really undermines their plain meaning argument. On cylindrical pins, note that the claims of the 076 patent say bone screws. So, the specification actually talks about, and I believe I heard Mr. Lowe to acknowledge that the cylindrical pins could create a firm connection. But even if they can't, if they're threadless, then they're not a bone screw. And the patent claims asserted against Globus are for bone screws. So, I don't understand. Is that your argument with respect to Dependent Claim 30 or whatever it is about the threadless cylindrical pins? Right. The threadless cylindrical pins of the 076 patent is silent on whether they create a firm connection. I thought I heard Mr. Lowe suggest that they could create a firm connection. They operate like a nail. They create it in a different way. But the critical thing for purposes of We're talking about anchorable within the 207 patent. And the 207 patent is talking about these fixation elements. And then Claim 30 talks about how fixation elements mean threadless cylindrical pins. And I don't believe Claim 30 is asserted against us, Your Honor. No, but it's a way to understand what does fixation elements mean in terms of what does anchor mean with respect to those fixation elements. And the critical thing to understand is Claims 38 to 41 which don't contain the anchorable within limitation at all are not asserted here. So, though anything in the spec and we acknowledge that the spec of the 207 does refer to some non-rigid connections, it relates to those claims. The idea of anchorability, the capability to anchor refers to a firm connection. Last, on position between I understood Mr. Lowe to agree that we all see these diagrams the same way. And it's clear that the best, the public notice function of the patent laws is best served by holding them to what they said. And it wasn't just in the picture. They said the bone screw holes form in the plate. And hence the heads of the bone screws are not positioned between the upper and lower planes of the body. So we think that that is unequivocal and clear and dispositive as to the position between the shoes. If there are no further questions, we urge the Court to reverse. Thank you. Thank you. We thank all counsel on the cases submitted and conclude our proceedings this morning.